COOLEY LLP
JOHN HEMANN (165823)
(jhemann@cooley.com)
MAX A. BERNSTEIN (305722)
(mbernstein@cooley.com)
3 Embarcadero Center
20th Floor
San Francisco, California 94111-4004
Telephone:  +1 415 693 2000
Facsimile:  +1 415 693 2222

Attorneys for Petitioner
SERGUEI ADONIEV

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGUEI ADONIEV,<br><br>            Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>            Respondent. | Civil Case No.<br><br>*Related Crim. Case No. 2:96-cr-00977-RAP*<br><br>**SERGUEI ADONIEV'S UNOPPOSED PETITION FOR *CORAM NOBIS*** |

## I. INTRODUCTION

This unopposed Petition for a Writ of *Coram Nobis* seeks relief from a guilty plea and conviction that were based on patently incorrect immigration advice provided by the defense attorney at the time of the guilty plea. Petitioner Serguei Adoniev respectfully requests that he be permitted to withdraw his 1998 guilty plea to conspiracy to commit wire fraud and that the convictions that were based on that plea be vacated. This relief is appropriate under clear Ninth Circuit precedent, see *United States v. Chan*, 792 F.3d 1151 (9th Cir. 2015), and the United States does not oppose the writ being issued.

Mr. Adoniev was indicted for wire fraud based on a commercial transaction between a business he had a partial ownership stake in and an affiliate of the government of Kazakhstan. In 1997, upon the recommendation of his then-attorney, he pled guilty and was sentenced to 30 months incarceration. Mr. Adoniev served his sentence and was then deported from the United States.

Mr. Adoniev's seeks an order vacating his conviction and guilty plea under the *coram nobis* doctrine principally because his representation during his criminal proceeding fell below an objectively reasonable standard. Mr. Adoniev's defense attorney gave him materially incorrect advice regarding the immigration consequences of his guilty plea, and it was in reliance on this advice that he pled guilty. The caselaw is definitive that such circumstances alone serve as a basis for *coram nobis* relief, when ongoing immigration consequences of a conviction prejudice the defendant. Significant other deficiencies and irregularities in Mr. Adoniev's representation and conviction, including as described below, provide further support for the requested relief and demonstrate its fundamental justice.

Since his conviction, Mr. Adoniev has become a successful businessperson. He built a cutting-edge communications company in Russia after his detention and sold it in 2014. After selling that company, his business pursuits and family connections led him to seek to return to the United States. However, he cannot do so because of his 1998 fraud convictions, as he is inadmissible under the immigration laws. Despite his success, bank compliance departments and potential business partners are reluctant to do business with him only because of the convictions he should not have suffered in the first place.

Mr. Adoniev's counsel has engaged in extensive discussions with the United States Attorney's Office regarding his case and this petition. Government counsel has informed the undersigned that the United States does not oppose the petition or the relief sought. Mr. Adoniev served his sentence and the government will move to dismiss the indictment should the petition be granted. Accordingly, Mr. Adoniev respectfully requests that the Court grant the petition, allow him to withdraw his guilty plea, and vacate the conviction.

## II. BACKGROUND

### A. Mr. Adoniev's Indictment and Conviction.

Mr. Adoniev is a businessman and philanthropist currently living in London. During the 1990s, Mr. Adoniev founded and operated agricultural export businesses with a focus on the former Soviet Bloc. In 1993, one of Mr. Adoniev's businesses, MCW, entered into a contract with an affiliate of the government of Kazakhstan for the sale of sugar ("ICBC"). (Declaration of Serguei Adoniev ("Adoniev Decl.") ¶ 3.) Under the terms of the contract, MCW's obligation to deliver the contemplated sugar shipments was triggered by ICBC's payment in full. (*Id.*) However, ICBC made only partial payments, never providing the payment in full required. MCW kept the partial payments, pending resolution of a dispute with ICBC over the exchange rate at which any refund would be provided. (*Id.*) ICBC, however, took the position that MCW had wrongfully kept its money and failed to deliver the sugar as promised. (*Id.*)

In connection with this commercial contract dispute, the U.S. Attorney's office indicted Mr. Adoniev for wire fraud and related charges in 1996. (*See* Declaration of John Hemann ("Hemann Decl."), Ex. A (Dkt. No. 29, Adoniev Criminal Indictment). Specifically, the U.S. Attorney's office alleged 18 counts against Mr. Adoniev, alleging he and others associated with MCW planned a scheme to defraud the government of Kazakhstan by receiving the payments contemplated by the contract, but not delivering the sugar, and bribed a Kazak official to facilitate the scheme. (*Id.*)

Mr. Adoniev was arrested in Germany on a warrant issued based on the indictment and detained pending extradition proceedings. Mr. Adoniev had no experience with the U.S. court system and did not know of an American attorney to call on. (Adoniev Decl. ¶ 6.) His wife contacted a friend who put her in touch with attorney Stephen London. (Adoniev Decl. ¶ 6.)

Mr. London was and is based in New Orleans and licensed only in Louisiana. (Declaration of Stephen London ("London Decl.") ¶¶ 2, 5-6.) Mr. London had then only recently become a member of the bar and had no relevant experience with fraud cases. Moreover, Mr. London had never appeared in court in California and was not familiar with the Los Angeles U.S. Attorney's office.

Mr. Adoniev's wife arranged for Mr. London to travel to Germany to meet Mr. Adoniev and Mr. London proposed that he be retained for a small flat fee. Mr. Adoniev hired Mr. London, the first and only lawyer he met, on these terms. Mr. Adoniev did not understand that hiring an inexperienced Louisiana lawyer to handle a California business fraud case was both unusual and inadvisable, and did not appreciate that Mr. London had never before handled a case of this nature or put on a defense in this court. (Adoniev Decl. ¶ 6; London Decl. ¶ 6.) After consulting with Mr. London, Mr. Adoniev consented to extradition and was transported to Los Angeles in custody. He was ordered detained and housed in the MDC pending trial, where he remained until he was sentenced.

Mr. London continued to live and work in New Orleans during the pendency of Mr. Adoniev's case. Mr. London met with Mr. Adoniev only a handful of times and all in a custodial environment. Shortly after taking the case, Mr. London recommended that Mr. Adoniev take a plea deal offered by the government. (London Decl. ¶¶ 17-18.) After a cursory review of the alleged facts, and unsuccessful and ill-prepared trips to Russia and Kazakhstan, Mr. London advised that a defense would be difficult to mount, that a jury would assume a Russian was guilty, and that Mr. Adoniev should plead guilty to avoid a lengthy prison sentence.

Under the deal that ultimately took shape, Mr. Adoniev would plead guilty to one count of conspiracy and seven counts of wire fraud and agreed to a sentence of 30 months of imprisonment, $1 million in restitution, and a $60,000 fine. (*Id.* ¶¶ 25, 28; Hemann Declaration, Ex B, (Dkt. No. 47, Adoniev Plea Agreement) ¶¶ 2, 6, 8.) He was sentenced on June 15, 1998. *See* Hemann Decl., Ex. C (Dkt. 55, Entered Stipulated Sentencing Recommendation).

### B. Mr. Adoniev Was Given Incorrect Immigration Advice.

It was centrally important to Mr. Adoniev that he someday be able to travel back to the United States, after serving his term. (Adoniev Decl. ¶¶ 9-10.) Accordingly, he specifically asked Mr. London whether the plea and conviction would have immigration consequences. (*Id.*; London Decl. ¶ 23.) Mr. London advised him that it would not, explaining that the agreement would permit Mr. Adoniev to return to the United States after a voluntary deportation. (London Decl. ¶ 25 ("I was not aware of the 1996 amendments to the Immigration and Nationality Act or the fact that those amendments eliminated all discretion as to deportation of non-citizens convicted of aggravated felonies…").) By this time, Mr. Adoniev had been in custody for over 18 months and, with the assurance that he could return to the United States, accepted the offer. Mr. Adoniev served his sentence and was deported in August 1999, upon his release.

The advice Mr. London gave Mr. Adoniev was wrong. At the time of the plea, the law was clear that wire fraud is a crime of moral turpitude and an aggravated felony. With such a conviction, not only was Mr. Adoniev subject to mandatory removal, he was and is deemed inadmissible and cannot reenter the United States. *See* 8 U.S.C.A. § 1182(a)(2)(A)(i). Mr. London did not understand that this was the law and counseled Mr. Adoniev otherwise. (London Decl. ¶¶ 24-25.)

Mr. London himself has acknowledged that he provided this advice affirmatively to Mr. Adoniev and that it was wrong when rendered. (*Id.*) Had the immigration consequences of his plea deal been explained to him, Mr. Adoniev would not have taken it, including because his family was planning to remain in the United States at the time (one of his sons lives in Los Angeles today). (Adoniev Decl. ¶ 9-10.)

The plea agreement is silent as to immigration consequences, and neither the Court nor the prosecutor explained these consequences to Mr. Adoniev before or during the plea hearing. As such, Mr. Adoniev had only his counsel's incorrect advice that the plea would not bar his ability to return to the United States. This misstatement was never corrected before Mr. Adoniev pleaded guilty.

### C. There Were Other Flaws in the Investigation, Plea, and Conviction.

There were numerous other flaws in the manner that Mr. Adoniev was prosecuted, represented, and convicted.

#### 1. The prosecution was premised on an insufficient factual premise.

The conviction was based on a legally insufficient factual basis, including as set out in the plea agreement. The plea agreement states that the underlying contract contemplated that Adoniev's company would be paid in installments for the sugar shipments at issue. (*See* Hemann Decl., Ex. B (Adoniev Plea Agreement) at p. 6.) This is incorrect, as the agreement instead required "100% advance payment" before any sugar shipments were obligated, a fact that can be readily established by the plain language of the agreement itself. (*See* Hemann Decl., Ex. D (August 26, 1993 Contract between MCW and ICBC (the "contract")) ¶ 8.)

This mistake of fact, appearing in the plea agreement and animating the prosecution more generally, was of central importance: In the underlying contract dispute, Mr. Adoniev's company contended it was *excused* from shipping any sugar because the other party, ICBC, had failed to make a full advance payment as required by the contract, and instead made partial installment payments that never added up to the payment amount required. (Adoniev Decl. ¶ 4.) That is, it was because Mr. Adoniev's company, MCW, never received this full, up-front payment, it contended it was excused from further performance and therefore did not complete the sugar shipments. (*Id*.) But the plea deal, and the prosecution more generally, misstated these facts, suggesting that MCW received installment payments contemplated under the contract, but then refused to perform, absent any breach from the other party. (*See* Hemann Decl., Ex. B (Adoniev Plea Agreement) at p. 6 ("Under the agreement . . . [ICBC] would in turn send the money in installments by way of bank wire transfers. . . .").)

The prosecutor did not inform the Court of the contract terms and, indeed, led the court to believe that MCW's "breach of contract" was sufficiently clear to support a criminal conviction of Adoniev and lengthy prison sentence. That the prosecutor was mistaken on this threshold issue, and that Mr. Adoniev's counsel failed to correct the record, exposes that the plea negotiations were *pro forma*.

Indeed, Mr. London appears not to have reviewed the contract that was alleged to have been breached that formed the basis of the charges—and that was central to any effective defense of Mr. Adoniev. (London Decl. ¶ 17(b).) Nor did Mr. London effectively interview key witnesses, investigate how the Kazakh courts had adjudicated the contract dispute that was alleged to be at the center of the fraud, or have all of the documents he received in Russian translated. (*Id.* ¶¶ 15-19.) Mr. London seems to have taken for granted the incorrect premise that Mr. Adoniev's company had improperly received money without delivering a corresponding sugar shipment and accepted the conclusion that this constituted fraud. (*Id.* ¶ 17(b).)[1]

### 2. The Court's Rule 11 Colloquy was Inadequate.

The lack of a proper factual basis for a fraud conviction might have been revealed through a proper plea colloquy, but the Court did not conduct one. The prosecutor's description of the factual basis was perfunctory and not sufficient to demonstrate proof of guilt beyond a reasonable doubt. (Hemann Decl., Ex. E (Transcript of April 23, 1998 Hearing re: Change of Plea ("Plea Colloquy Transcript")) at 181:22-182:20.)

When asked by the Court to describe why he was guilty, Mr. Adoniev indicated *probable* agreement with what the prosecutor had said were the pertinent facts. (Hemann Decl., Ex. E (Plea Colloquy Transcript) at 182:21-183:11.) In response to the court's request that he explain why he was pleading guilty, Mr. Adoniev said, "I *probably* agree with the factual basis – with what [the prosecutor] said. It's basically what --" The court then interrupted and completed Mr. Adoniev's sentence with "what you did." (*Id.* (emphasis added).) Mr. Adoniev did not indicate that he agreed with the Court's statement. (*Id.*)

---

[1] Mr. London did not pursue the obvious defense that given the absence of evidence that Mr. Adoniev had fraudulent *intent* at the time his company was negotiating the import agreement, Mr. Adoniev could not be convicted for wire fraud for what otherwise amounted to no more than a civil contract dispute over payment. *See, e.g., United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) ("there is no fraudulent scheme without specific intent") (citation omitted)); *see also U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("a party claiming fraud must prove fraudulent intent at the time of contract execution"). More generally, because Mr. London did not even review the underlying contract, he does not seem to have considered at all the defense that Mr. Adoniev's company was excused from performance due to the breach of the other party—strongly militating against the theory of fraud the government suggested.

This colloquy did not establish anything amounting to criminal conduct. If nothing else, Mr. Adoniev's use of the word "probably" required the court and defense counsel to step in to ensure that Mr. Adoniev was actually admitting facts that could form the basis for a criminal conviction beyond a reasonable doubt. Rule 11 "obliges the trial court to engage the defendant in a colloquy at the time the plea is entered for the purpose of establishing a complete record of the constitutionally-required determinations that the defendant is acting voluntarily, with an understanding of the charges which have been leveled at him, and *upon a factual basis which supports his conviction*." *United States v. Jimenez-Dominguez,* 296 F.3d 863, 866 (9th Cir. 2002) (emphasis added).

### 3. The stipulated sentencing agreement filed by the prosecutor differed from the parties' plea agreement.

The terms of the parties' agreement articulated by the prosecutor during the plea colloquy were different than the terms in the stipulated sentencing agreement. (London Decl. ¶ 21.) During the proceeding, the prosecutor stated Mr. Adoniev would pay $1 million in restitution, consistent with the plea agreement. (Hemann Decl., Ex. E (Plea Colloquy Transcript) at 15:23-16:3; London Decl. ¶ 21; Hemann Decl., Ex. B (Plea Agreement) ¶ 6.) It appears that *the prosecutor* changed the amount reflected in the stipulated sentencing agreement to state that Mr. Adoniev would pay just over $4 million in restitution. (*See* London Decl. ¶ 21; Hemann Decl., Ex. C (Stipulated Sentencing Recommendation) at p. 237.) Neither Mr. Adoniev nor Mr. London agreed to this change, or were ever made aware of it—the prosecutor signed on London's behalf, indicating Mr. London's approval. (*Id.*; Adoniev Decl. ¶ 12.)

## III. ARGUMENT

### A. The Petition for *Coram Nobis* Should be Granted.

The fact that Mr. Adoniev's defense attorney provided him incorrect advice regarding immigration consequences and the ongoing prejudice he is suffering provide sufficient bases for the Court to allow Mr. Adoniev to withdraw his guilty plea and vacate his conviction. The other irregularities surrounding his conviction demonstrate the imperative of this relief.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SERGUEI ADONIEV'S PETITION
FOR *CORAM NOBIS*

The writ of error *coram nobis* provides a remedy to attack an unconstitutional conviction in cases in which the petitioner already has fully served a sentence. *United States v. Walgren*, 885 F.2d 1417, 1420 (9th Cir. 1989). District courts are authorized to issue the writ pursuant to the All Writs Act. *Id.*

The Ninth Circuit looks to four factors when determining whether to grant a petitioner *coram nobis* relief: Whether (1) a more usual remedy is available; (2) the conviction's adverse consequences are sufficient to satisfy the case and controversy requirement of Article III; (3) the error is of a fundamental character; and (4) the petitioner has a valid reason for not attacking the conviction earlier. *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987). Each criterion is satisfied here.

### 1. A more usual remedy is not available.

Mr. Adoniev has already served his sentence and is no longer in custody. As such, he cannot seek relief through a *habeas corpus* petition. The Ninth Circuit has found in this circumstance that a petitioner's only remedy to overturn a conviction is a petition for *coram nobis*, and therefore a more usual remedy is not available. *See Yasui v. United States*, 772 F.2d 1496, 1498 (9th Cir. 1985) (superseded on other grounds) ("The writ of error *coram nobis* fills a void in the availability of post-conviction remedies in federal criminal cases."); *see also United States v. Kwan*, 407 F.3d 1005, 1012 (9th Cir. 2005) (abrogated on other grounds) (same).

### 2. The adverse consequences are sufficient to satisfy the case and controversy requirement of Article III.

Mr. Adoniev continues to face significant immigration consequences from his conviction. Not only was Mr. Adoniev deported, but he is now statutorily barred from entering the United States, including to see his family or conduct business. The relevant statute, 8 U.S.C.A. § 1182(a)(2)(A)(i), provides that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude" is "inadmissible." Wire fraud is a crime involving moral turpitude. *See, e.g.*, *United States v. Marcu*, 210 F. Supp. 3d 1234, 1241 (D. Nev. 2016) (finding that wire fraud is a crime involving moral turpitude). Accordingly, Mr. Adoniev is ineligible to return to the United States,

a consequence never explained to him by his attorney or revealed by the court during the Rule 11 hearing.

The Ninth Circuit has found it is "undisputed" that this kind of immigration consequence constitutes a sufficient adverse consequence for *coram nobis* relief. *See, e.g., Kwan*, 407 F.3d at 1014 (finding deportation to be an adverse consequence creating standing). Moreover, "lingering collateral consequences" of a conviction also create standing. *Walgren*, 885 F.2d at 1420. Mr. Adoniev's conviction has interfered with his ability to secure loans from financial institutions or work with certain business partners, even outside of the United States (Adoniev Decl. ¶ 17)—the kind of lingering collateral consequences that also can, and should, be remedied by *coram nobis* relief.

### 3. The error is of the most fundamental character.

The ineffective assistance of counsel provided to Mr. Adoniev throughout his criminal case, but especially with regard to the immigration advice he received, was of the most fundamental character. The evidence shows that (1) his counsel's performance fell below an objective standard of reasonableness and (2) that the deficiency in his counsel's performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *see also Padilla v. Kentucky*, 559 U.S. 356, 368 (2010) ("Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute[.]").

#### a. Mr. London's advice was not objectively reasonable.

Mr. London's representation fell below an objective standard of reasonableness. Mr. London had neither the experience nor the knowledge to undertake the representation of Mr. Adoniev in this case or to provide advice regarding immigration consequences to him. Mr. Adoniev was incarcerated throughout the process and had no ability to obtain appropriate representation or learn that what Mr. London was telling him was wrong.

The affirmative misrepresentations of the law made by Mr. London to Mr. Adoniev render his assistance constitutionally ineffective. Specifically, because Mr. London incorrectly stated the immigration consequences of the plea deal, consequences that simple due diligence would have revealed, his counsel was ineffective and misleading. *See, e.g., Chan*, 792 F.3d at 1154

("affirmative misrepresentations by counsel regarding immigration consequences constitutes deficient performance under *Strickland*[.]"). Mr. London had a duty to Mr. Adoniev, a non-citizen, to accurately advise him of the immigration consequences of the proposed plea deal. *See, e.g.*, *United States v. Sun Hwang*, 658 F. App'x 874, 876–77 (9th Cir. 2016) ("When a criminal defendant is not a citizen, attorneys have a duty to inform their clients of the immigration consequences of a guilty plea."); *see also United States v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002) ("an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is . . . objectively unreasonable.").[2]

### b. Mr. London's advice prejudiced Mr. Adoniev.

Mr. London's incorrect advice, and the failure of the Court or prosecutor to correct it, prejudiced Mr. Adoniev, as he was convinced to take a plea deal he otherwise would not have accepted. *See Strickland*, 466 U.S. at 694 (finding prejudice where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

The Ninth Circuit's decision in *Sun Hwang*, which considered similar facts, supports the finding of prejudice: The defendant explained had she been made aware of the deportation consequences of a guilty plea, she would not have pled guilty. *Sun Hwang*, 658 F. App'x at 877. As was the case here, the defendant had repeatedly inquired into the immigration consequences of the plea before taking the deal. *Id*. ("Hwang explains that she placed a significant emphasis on the immigration consequences of a conviction: she asked her attorney repeatedly about the immigration consequences of her case. . . ."). The Ninth Circuit explained "[u]nder our precedent in *United States v. Kwan*, this is sufficient to establish prejudice under the second prong of *Strickland*." *Id*. Here too there was prejudice for substantially the same reasons.

---

[2] At the time of Mr. Adoniev's plea, it was clear that defense counsel had the primary duty to explain immigration consequences to clients facing deportation. *Michel v. United States,* 507 F.2d 461, 465 (2d Cir. 1974) ("Where his client is an alien, counsel and not the court has the obligation of advising him of his particular position as a consequence of his plea."); ABA Standards for Criminal Justice, 14-3.2 Comment, 75 (2d ed.1982) ("the American Bar Association's Standards for Criminal Justice provide that, if a defendant will face deportation as a result of a conviction, defense counsel 'should fully advise the defendant of these consequences'").

**4.     Adoniev had valid reasons for not attacking the conviction earlier and there is no prejudice to the government.**

Federal courts have jurisdiction to consider flawed convictions, irrespective of the passage of time. *United States v. Morgan*, 346 U.S. 502, 512-13 (1954). Courts look only to whether the petitioner had valid or "sound" reasons for not bringing the petition sooner and whether the government will be prejudiced by the elapsing time. *Id.* at 512; *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994). Mr. Adoniev has valid reasons, given the circumstances.

For almost two decades after his conviction, Mr. Adoniev did not know he had any basis for seeking relief, as he did not understand that his prior conviction would preclude his admission to the United States until 2014. (Adoniev Decl. ¶¶ 13-14.) After his deportation in 1999, Mr. Adoniev returned to Russia and for fifteen years, he worked to reestablish and grow his businesses and start his successful mobile broadband company, Yota. (*Id.*) It was only after selling Yota in 2014 that Mr. Adoniev sought to return to the United States, only to determine that he was barred from doing so. (*Id.*)

Given this revelation, Mr. Adoniev began working with British attorneys to explore his options. (Adoniev Decl. ¶ 14.) They retained American co-counsel and collectively undertook a time-consuming investigation of the underlying facts of his case—an investigation never conducted by Mr. London, or the prosecutor for that matter, and made more difficult by the passage of time. (*Id.*) Based on this investigation, his attorneys concluded his conviction was fundamentally flawed and that *coram nobis* relief was appropriate. (*Id.*)

However, Mr. Adoniev's counsel also determined that his petition would be significantly strengthened, if they could convince the U.S. Attorney's office of its merits. (Adoniev Decl. 15.) Given this well-reasoned belief, Mr. Adnoniev's counsel opted to open a dialogue with the U.S. Attorney's office, rather than immediately raise his petition with the Court. (*Id.*) In 2017, after concluding their investigation, Mr. Adoniev's counsel entered discussions with then-criminal chief Lawrence Middleton, which discussions were actively continued through 2018. (*Id.*) However, Mr. Middleton left the U.S. Attorney's office in 2019, never having reached a final decision on

whether to oppose Mr. Adoniev's petition and requiring Mr. Adoniev to raise the issue with new attorneys for the government.

Mr. Adoniev retained his present counsel at Cooley LLP in January 2020. The undersigned agreed with Mr. Adoniev's prior counsel's assessment that securing the agreement of the United States Attorney's office would significantly improve the chances of success and therefore merited all possible effort.[3] (Hemann Decl. ¶ 4.) Cooley's further investigation also developed new facts regarding Mr. London's ineffective representation in 1997 and 1998. (*Id*.) Armed with these facts, the undersigned furthered the discussions with the U.S. Attorney's office. (*Id*.)

It was only on June 26, 2021, that the U.S. Attorney's office indicated it would not oppose the present petition. (Hemann Decl. ¶ 4.) Mr. Adoniev's counsel at Cooley LLP promptly began drafting the present petition. (*Id*.) The undersigned submit that it was sound reasoning to first secure the non-opposition of the government before filing the present petition and that Mr. Adoniev, through his counsel, has acted as diligently as possible, once this non-opposition was indicated.

Moreover, there is no risk of prejudice to the government here, as the government *does not oppose the petition* and does not intend to retry Mr. Adoniev. *See Telink, Inc.*, 24 F.3d at 45 (explaining laches considerations in assessing prejudice to the government of elapsed time between conviction and *coram nobis* petition).

### IV. CONCLUSION

For the reasons stated herein, Mr. Adoniev's unopposed petition should be granted. He should be permitted to withdraw his guilty plea, and the Court should vacate his conviction

Dated: September 17, 2021                    COOLEY LLP

By: */s/ John H. Hemann*
John H. Hemann

Attorneys for Petitioner Serguei Adoniev

---

[3] The government's non-opposition obviates the need for the Court to resolve any legal or factual disputes and establish that the government will not be prejudiced by the granting of the petition.